Filed 6/8/23 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.F., a Person Coming Under the Juvenile Court Law. | A166150 |
| SAN FRANCISCO COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>W.F.,<br><br>        Defendant and Appellant. | (San Francisco City & County Super. Ct. No. JD22-3083)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 17, 2023, be modified as follows:

On page 42, the Disposition should be modified to read as follows: "The jurisdictional findings and orders as to father, as well as the related dispositional orders regarding removal and substance abuse testing and treatment, are reversed. The matter is remanded for further proceedings consistent with this opinion to the juvenile court with directions to issue new

1

or modified orders of jurisdiction and disposition consistent with the findings in the opinion."

There is a change in the judgment.

The petition for rehearing is denied.

Dated: _____

Humes, P. J.

Filed 5/17/23 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.F., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO COUNTY HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>W.F.,<br><br>     Defendant and Appellant. | A166150<br><br>(San Francisco City & County Super. Ct. No. JD22-3083) |

　　　W.F. (father)[1] appeals from the juvenile court's jurisdictional findings and dispositional orders adjudicating his son, S.F. (minor), a dependent of the court under Welfare and Institutions Code section 300, subdivision (b)(1)[2] and removing minor from father's custody.  Father asserts (1) the jurisdictional findings are not supported by substantial evidence, (2) the dispositional order removing minor from father's custody is not supported by substantial evidence of a clear and convincing nature and the orders

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II. C.

　　　[1] Mother is not a party to this appeal.

　　　[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

requiring him to engage in substance abuse testing and treatment are not supported by substantial evidence, and (3) the court erred in placing minor in foster care without first complying with the provisions of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).

We agree that neither the jurisdictional findings nor the challenged dispositional orders are supported by substantial evidence, but conclude the juvenile court complied with ICWA.

## I. BACKGROUND

The San Francisco County Human Services Agency (Agency) responded to a 10-day "Emergency Response Investigation Referral" regarding mother and minor, then 11 months old, after mother was released from a section 5150 hold. The Agency and mother agreed to a safety plan whereby minor would remain in maternal grandmother's care and mother would work with a non-court family maintenance program through the Agency. Two weeks later, mother violated the safety plan when she "brandished a knife at the grandmother, and a physical fight occurred between [mother] and [grandmother] in the presence of [minor]," which resulted in mother taking minor "on public transit, intoxicated." At the time, father was residing in New York with his sister. He was, however, providing monetary assistance to mother and minor.

### *Detention*

The Agency detained minor and filed a section 300 petition alleging failure to protect under section 300, subdivision (b)(1)[3] and supported by five factual allegations (counts B1 to B5). Three of the counts were directed at

---

[3] Section 300, subdivision (b)(1) authorizes juvenile court jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" any of four specified circumstances. (§ 300, subd. (b)(1)(A)–(D).)

2

mother (B1 to B3), the remaining two (B4 and B5), at father. Count B4 alleged "father has anger management issues that require assessment and treatment in that he had been sending the mother threatening text messages. [Father] has also sent the maternal grandmother and the mother messages indicating that he would send someone to hurt them." (Capitalization omitted.) Count B5 alleged father "reported that he used to abuse crack cocaine and alcohol but that he is about 2 years sober." (Capitalization omitted.)

In its detention report, the Agency stated it had notified father of minor's detention. Father stated he had been at the hospital for minor's birth but had not signed the birth certificate due to a disagreement with mother. However, he had taken a DNA test, which confirmed he was minor's father. Father identified his two sisters (minor's paternal aunts) as potential placements.

The Agency reported father as saying the following: He had abused "crack, cocaine and alcohol" in the past but had "been clean about 2 years." He had previous arrests, one being domestic violence related and the other "with [mother] when they were still together." He had been with mother "during her pregnancy and she was clean for 9 months." He "moved back to New York where he is from to get away from the drug environment in [the] San Francisco Bay Area." He desired "to take full custody of [minor] and would be willing to move to California to do so or take him to New York if he could." He maintained "mother's new boyfriend is the reason why she relapsed."

The Agency reported that when asked about father, mother and grandmother "said that they are receiving threats from him in text messages stating that he will send over a woman . . . to hurt them." Mother was

3

"interested in filing a restraining order" against father and "was in the process of applying for one." Mother stated she and father had " 'tussled' together when they were dating, but that she wouldn't consider it to be domestic violence." Mother's boyfriend stated mother had been "20 days sober" before she "receiv[ed] threatening text messages from [father], and that is when she started using because she was stressed out."

At the detention hearing, the court found a prima facie case had been made that minor came within section 300 and removal was necessary to protect minor's physical and emotional health.[4] The court ordered minor detained, placed in foster care, and set the matter for a jurisdiction and disposition hearing.

Prior to the hearing, father sought to elevate his status to that of presumed father. In his motion, father stated he was "physically present [for] [minor] . . . until he moved to New York on June 29, 2021," when minor was three months old. During that time, he had regularly "bathed [minor], burped him, fed him, changed his diapers, and took care of him alone." He moved to New York "after a domestic violence incident with [mother]," because he "thought taking some space would be good for his relationship with [mother] and he needed the support of his family in New York." Even though he had moved, he still spoke with minor "by way of FaceTime on a

---

[4] At the detention hearing, the juvenile court must order the child's release from custody unless a prima facie showing is made that the child comes within a section 300 ground for dependency (here subd. (b)) and the court finds, under section 319, subdivision (c), that continuation in the home would be contrary to the child's welfare, which includes "substantial danger to the physical health of the child or the child is suffering severe emotional damage, and there are no reasonable means by which the child's physical or emotional health may be protected without removing the child from the parent's or guardian's physical custody." (§ 319, subd. (c)(1).)

daily basis," as did his sister, with whom he lived. Additionally, both he and his family helped to support minor. This support included a six-month supply of diapers sent to minor from paternal uncle, money sent to mother and maternal grandmother by father, and many "baby items," including formula, a stroller, clothes, shoes, toys, diapers, teething supports and a walker, all for which father provided receipts. While he was in New York, he had become concerned about mother and minor and had called the San Francisco Police Department on two occasions "to ask them to conduct a well-child check" on mother's home.

### *Jurisdiction and Disposition*

*The Agency's report stated as follows*: Father agreed that the B5 allegation—that he had abused "crack cocaine and alcohol but that he is about 2 years sober"—was true. (Capitalization omitted.) Father said he started drinking at age 17[5] and began using cocaine in 2018, but he no longer drank alcohol and had "been clean of cocaine use since 2020." The Agency had made a referral for "drug testing to assess his level of drug use," but as of the date of the report, father had not tested. Father stated he had focused on "more pressing matters such as securing housing and employment." The Agency was therefore "unable to determine the degree of [father's] abstinence from substance use."

With respect to the B4 allegation, the Agency reported father and mother had been arrested for a May 2021 domestic violence incident, shortly before father left for New York. Mother stated father had "hit her, grabbed at her and pushed her in the past," was "verbally abusive," and "had threatened her and would 'get in her face' while they were in a relationship." She stated father "had hit her with a fan while she was swinging a golf club

[5] Father was 56 years old at the time of the report.

5

at him," which had led to their joint arrest for infliction of corporal injury on a spouse or cohabitant. Father "denied any domestic violence" toward mother, and maintained it was mother who "had taken a swing at him with a golf club."

The Agency further reported father had moved back to California "upon receiving the news that the minor was involved" in dependency proceedings but had not yet found "stable housing or income." The Agency had "encouraged [father] to apply for public assistance if needed," but had made no referrals in this regard. Father acknowledged he had not "parented the minor since leaving San Francisco" in June 2021 but stated he had financially helped to support minor and was seeking to reestablish his connection with minor through supervised visitation. Father currently had supervised visitation with minor two times per week and had been "consistent" with his visitation.

The Agency's case plan objectives for father included securing appropriate housing, substance abuse assessment, random drug testing, individual therapy to focus on "better communication with mother as a co-parent," and completing parenting education. The Agency provided referrals for a substance abuse assessment, drug testing, parenting education classes, and a "supportive letter to Compass Family Services." The Agency did not provide a referral for any kind of domestic violence services, instead stating in the domestic violence "follow-up needed for parent(s)" section of its report, mother and father "are not in a relationship with each other and they only plan to co-parent the child together. Perhaps, individual therapy for each parent to learn to communicate with each other more effectively would be a more suitable tool for the parents to co-parent together." (Capitalization & boldface omitted.)

6

Five days before the jurisdiction and disposition hearing, father completed a self-reporting substance use assessment through the San Francisco Health Network Treatment Homeless Prenatal Program. Father reported smoking marijuana once a month and not using alcohol or cocaine. The therapist at the services center concluded that, given father's assessment and report of past and current services, father did "not meet medical necessity for . . . Substance Use Disorder Treatment[] at this time. [Father] endorses 2 years of abstinence from alcohol and cocaine and ahs [*sic*] successfully completed treatment in 2019. [Father] encouraged to continue working with community support resources included NA and HPP to maintain abstinence. [Father] encouraged to reach out if needing additional support or experiencing a relapse."

At the contested jurisdiction/disposition hearing, the court heard from father, mother, the child welfare worker, and the dependency protective services worker.

*Father testified as follows*: He had moved to New York in June 2021, and it was after that that he first learned mother was using drugs after minor's birth. Mother had not been using drugs while they were together. His sobriety date was December 2019. He was not "actively working" on the 12 steps. He did not have a sponsor but had "acquaintances that [he] obtained [through] Narcotics Anonymous and AA." His last NA meeting was three months before the hearing. The protective services worker had spoken to him about the drug testing referral. But "[t]here was just so much on my plate" because he was "looking for housing. I didn't know where I was going to sleep my head after that point. The hotel room ran out." He was attending parenting education classes and felt these were of real benefit and also helped him stay focused on sobriety. Prior to the hearing, he completed

7

a substance abuse assessment and had tested once, with negative results. While completing the assessment, he remembered taking an earlier assessment and completing a 90-day inpatient treatment in 2019. He had not previously mentioned the 2019 assessment and treatment because "[n]o one ever asked for it."

Father denied incidents of domestic violence but acknowledged the May 2021 incident, stating it "was a misunderstanding that . . . led to somewhere where it shouldn't have." The minor was not present and was with maternal grandmother at the time. Nor was minor present during other arguments he and mother had gotten into. He did not confirm one way or the other whether he and mother were going to continue their relationship, but said, "we're trying to accomplish things as parents and reunify our family. And there's issues that we both need to work on before we quote/unquote say that we're intimately involved."

He had not received any help from the Agency in terms of housing and was "pretty much doing everything on my own." He was open to other services, like "anger management classes," but hesitant to have too many services "to get piled up in all these groups that hinder me from getting a roof over my head so you guys can release my son to me." He wanted services that would assist him in obtaining "low subsidy" housing. He had just obtained employment and was scheduled to start work the week of the hearing.

*Mother testified as follows*: She had used drugs with father but "way before" she became pregnant or had minor.

She and father "got into an altercation and that led us to the jail," but it was "not a situation that continuously happened." They "had gotten into arguments. Again, not only that, there were certain physical situations. But

it's nothing like abuse at all." When she told the social worker she and father had gotten into "tussles," she meant, "Getting close. Getting loud." This did "include putting hands on each other" but "not like bruises and stuff like that; so—I've never really had an actual fight fight. It may have been just pushing away type of thing." There were "less than three" incidents, none of which were in the presence of minor; rather, he was with maternal grandmother.

With respect to the text messaging, mother initially stated she and father "had a lot of differences between each other; so I'm not going to say it was threatening. What I'm going to say is that I, like, moved on, and I was seeing someone different so there was lots of arguments and things going against both of us." On cross-examination, she said father's text messages "were not always threatening. But at times, you know, they could feel that way."

*The child welfare worker testified as follows*: From her "first interactions with [father], he indicated he wanted custody of [minor]." Father "was transparent" about his past alcohol and cocaine use but never indicated "he had completed a substance abuse treatment program." He also had not provided any documentation that he had engaged in a substance abuse treatment program. She could not recall if she had ever asked father about any prior treatment programs or if he had documentation.

She discussed the idea of placing minor with father with her supervisor. But they decided against it "because [father] hadn't been involved in the child's life for a prolonged period of time and there was that distance." At that time, mother had indicated she "was receiving text messages from dad that seemed threatening, and that was another factor;

9

however, I do believe that in that decision, it came down to the distance and the lack of involvement of father with the child throughout his life."

*The protective services worker testified as follows*:  Father did not provide him with "any verification that he attended any treatment program." Nor could he recall if he had ever asked father to do so.  Father did complete a substance abuse assessment.  The Agency had referred father to drug testing, but this was not mandatory as the court had not ordered father to "provide urinalysis testing."  Since that referral, father had taken one test, which showed he was "free of cocaine or amphetamine or anything."

Father denied any domestic violence toward mother and denied making any threats toward mother and maternal grandmother.  As to the May 2021 incident, father "indicated that mom was swinging either a golf club or a fan at him or towards him."  There was no evidence minor had been exposed to "any conflict between mother and father" or that "father used substances near [minor] ever."

Father had video visits with minor when he was in New York and transitioned to in-person visits when he moved back to California, and "[b]y all accounts," father had been "very appropriate" during visits.

At the beginning of the continued jurisdiction and disposition hearing, father's counsel sought a stipulation from Agency's counsel that AVATAR "is the official San Francisco City and County medical records system," and that the system reflects "confirmation that father did, in fact, attend treatment." The stipulation was based on a line in the self-reporting assessment completed by staff which stated "reporting 2 years of abstinence from cocaine and alcohol (consistent with AVATAR records)."  The court pointed out this line made no specific mention of a drug treatment program.  Counsel explained AVATAR "records would only reflect involvement in treatment. . . .

10

You wouldn't be able to get into those records were there not some interplay with a public health provider for those services." Agency counsel did not dispute this statement and stipulated to what was "written in the report."

Agency counsel then urged the court to sustain the section 300, subdivision (b)(1) counts against father. Counsel asserted father had "used drugs with the mother," "left [minor] with a mother that has an ongoing substance abuse problem," and "failed to protect his child." Counsel further maintained "mother agreed with the allegations that there has been violence, anger management issues involving father," but "just didn't want to say the magic words that they had 'domestic violence' issues."

Minor's counsel joined in the Agency's arguments, asserting "there has been evidence presented, in addition to what's in the report, that the nature of the relationship between the parents has been conflictual, and it appears to be that the parents are minimizing that relationship." Counsel was "concerned" about father's history of substance abuse.

Father's counsel pointed out the protective services worker had testified there was no evidence "that father had endangered [minor] or put his child . . . at risk." As to the B5 count, there was no evidence of any "continued or current risk of harm" to minor, no evidence father had "continued to use drugs. In fact, you have the opposite." Father acknowledged he had used substances in the past and he would therefore have a "lifelong problem." But there was "no evidence he used beyond those couple years." The substance abuse assessment was that he did not "require further treatment," and his drug test was negative. As to the B4 count, the May 2021 incident "happened a year ago," and there was "no evidence that anything ever took place in front of the minor."

11

Counsel emphasized the question before the court was "Does [father's] behavior pose a substantial risk of serious physical harm or illness to his child?" and asserted, "There's no evidence of that." Father was not a custodial parent, but rather was in New York, at the time of the events leading to detention. Father had "felt it was best for him to leave and have some space there, and he did. And he went to New York and had virtual visits with his son. And he sent assistance as he could. Financial assistance." Visits between father and minor had been "perfect," with "[n]o evidence of any substance use [or] conflict, [or] anger during those visits."

The court sustained the amended petition.[6] The court found mother to be credible. While mother was "clearly holding back" initially, under cross-examination "the truth came out in the end." There had been "yelling, arguing, tussling, and basic domestic violence" between mother and father. The court also found father "was quite candid in some aspects," but found him "not to be credible" in regard to domestic violence. And "[b]ecause of that lack of credibility in that particular area, it does reflect upon his self-reports when it comes to his lack of cocaine and drug use and abuse." Stating it was taking all of the evidence into account, the court found the B4 and B5 factual allegations true.

Without taking any additional evidence, the court moved on to removal and disposition, hearing additional argument by counsel.

Father's counsel asserted the "court . . . cannot find by clear and convincing evidence that [father] would pose a risk of harm to his child consistent with [section] 361.D." Thus, the "only basis" for removing minor

---

[6] The only amendment pertaining to father was adding his status as presumed father.

from father's custody was father's "poverty" and lack of housing, and those are not permissible bases for removal.

Agency counsel denied "seeking to remove the child from the father based on poverty." Rather, the Agency was "concerned" because father had "knowingly left his child with a parent that he knew or reasonably should have known had a chemical dependency problem that posed a risk." The Agency was also "concerned" about the "domestic violence incidents."

Father's counsel responded that the fact father "quote/unquote knowingly left the child with mother" was "not an allegation in the case." Furthermore, "[i]t was likely a smart decision for him to go away to his family at the time." What father "desperately needs help with [is] housing. That is what we are asking for." He was also "still requesting" placement with paternal aunts.

The court found by "clear and convincing evidence" that "there is a substantial danger to the physical health, safety, protection, or physical and emotional well-being of the child, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from both parents." It then identified the evidence it considered: (1) "the fact that three months after the younger person was born, he may have had a good reason, but [father] did leave for New York"; (2) "the yelling, arguing, tussling, domestic violence, even if it was mutual combat between the parents"; (3) "the recency of his cocaine . . . use for the two years in 2018 and 2020"; (4) even though father had recently started a job—the day of the hearing—he had "no means to . . . support the younger person"; (5) that father "currently does not have any housing"; and (6) that there was "currently no proof . . . to [father's] parenting skills or prior skills." The court also found father's progress in alleviating the need for placement

13

was "minimal" and that the Agency had made reasonable efforts to prevent the need for removal.

When father's counsel took issue with the court's finding that father's progress had been "minimal," given that father had returned to San Francisco to participate in the dependency proceeding, had completed all the visits, and had engaged in parenting classes, the court responded, "Flying out here to reunite with his son after leaving him, ditching him after three months . . . [¶] . . . I don't find that to be a factor." Counsel then took issue with the court's characterization of father as having " 'ditched' " minor, pointing out father had been helping to support mother and minor—because there are "custodial and noncustodial parents . . . doesn't mean the noncustodial parent 'ditched' their child." The court then revised its finding to state father's progress in alleviating the causes of the dependency had been "adequate."

The court thereafter imposed several reunification requirements, including that father "submit to random drug testing" noting any missed drug test would be considered "a dirty test," and that he "undergo substance abuse assessment and follow its recommended treatment."[7]

## II. DISCUSSION

### A. *Jurisdictional Findings*

#### *Mootness*

As a threshold matter, the Agency maintains father's appeal is moot. It points out the section 300 petition includes allegations as to both mother and

---

[7] The court imposed several additional requirements father does not challenge. These include, that he "secure appropriate housing for himself," "participate in individual therapy focusing on better communication with mother as a co-parent," and "participate in parenting education focusing on the care, provision and supervision of a toddler."

14

father and because the allegations as to mother are unchallenged, "this Court need not reach the merits of father's challenge to the B4 and B5 counts in the section 300 petition."[8]

"[W]here jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*).)

Father, relying on *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*), asks that we exercise our discretion to decide his appeal because the "jurisdictional orders . . . are . . . the basis for the dispositional orders removing the child that father challenges" and because the "jurisdictional orders . . . will undoubtedly prejudice him when he seeks to gain custody of his son."

Our Supreme Court has recently clarified, "where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' "—as is the case here—"the appeal is not moot." (*D.P., supra,*

---

[8] In its respondent's brief, the Agency suggests the B2 count was directed at both mother and father. It never advanced this contention in the juvenile court. It is also an inaccurate characterization of that count which was plainly directed at mother and stated, "The *mother has substance abuse issues* that requires assessment and treatment as evidenced by the following: [¶] . . . (A) It was reported that the mother abuses alcohol, ecstasy, cocaine, and methamphetamines. The Agency received referrals regarding recent incidents which involved mother being intoxicated from substances and needing family members to care for minor. [¶] . . . (B) The mother confirmed that she has used crystal meth and cocaine but that she does not do it regularly. [¶] . . . (C) The maternal grandmother reported that the mother needs to be in an in-patient. [¶] . . . (D) The night before [mother] was out drinking alcohol with her sister and [mother's boyfriend] believes that is what influenced her behavior. [Mother's boyfriend] stated prior to this, both had been sober for 20 days but she began to get threatening text messages from the alleged father and that is when she started using again." (Capitalization omitted.)

14 Cal.5th at p. 283 [disapproving *Drake M., supra,* 211 Cal.App.4th 754 to the extent it suggests "where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal" that, alone, is insufficient to avoid mootness and supports only the exercise of discretionary review].)

We therefore address father's challenge to the B4 and B5 counts.

### *Sufficiency of the Evidence*

As we have recited, the section 300 petition alleged dependency jurisdiction on the basis of subdivision (b)(1).  Under this provision, a juvenile court may assume jurisdiction where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.  (B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left.  (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment.  (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b)(1)(A)–(D).)

Thus, to obtain a jurisdictional determination under section 300, subdivision (b)(1), an agency must "prove three elements:  (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*); *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)  A court "need not wait until a child is seriously abused or injured to assume jurisdiction and

16

take steps necessary to protect the child." (*Cole L.*, at p. 602.)  And a parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Ibid.*)  However, " '[t]o establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' " (*Ibid.*; *D.L.*, at p. 1146.)

" ' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]  'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' (*In re I.J.* (2013) 56 Cal.4th 766, 773 . . . ; see *In re I.C.* (2018) 4 Cal.5th 869, 892. . . .)  However, '[s]ubstantial evidence is not synonymous with any evidence.  [Citation.]  To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' (*In re M.S.* (2019) 41 Cal.App.5th 568, 580[9] . . . ; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [(*J.A.*)]. . . [while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding].)" (*Cole L., supra*, 70 Cal.App.5th at pp. 601–602.)

---

[9] Disapproved on another ground as stated in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, footnote 8.

17

### *The B4 Count*

The B4 count alleged: "The father has anger management issues that require assessment and treatment in that he has been sending the mother threatening text messages. The . . . father has also sent the maternal grandmother and the mother messages indicating that he would [send] someone to hurt them." (Capitalization omitted.)

We preliminarily observe this count did not allege "domestic violence," but rather, anger management issues based on alleged text messages. A dependency petition must contain a "concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).) While there is no requirement that an agency "regurgitate the contents of the social worker's report into a petition," (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399–400), "[n]otice of the specific facts on which the petition is based is fundamental to due process because it enables the parties to properly meet the charges." (*In re T.V.* (2013) 217 Cal.App.4th 126, 131; see *In re Andrew S.* (2016) 2 Cal.App.5th 536, 544; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 751 ["a parent whose child may be found subject to the dependency jurisdiction of the court enjoys a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated"].)

However, "[p]utting aside whether it would be proper to sustain the petition based on an unalleged history of domestic violence" (*Cole L., supra*, 70 Cal.App.5th at pp. 604–605), there was insufficient evidence, in any case, to support a section 300, subdivision (b)(1) jurisdiction determination on the basis of "domestic violence."

18

Cases have made it abundantly clear that evidence of prior domestic violence between a mother and father, in and of itself, will not support jurisdiction under section 300, subdivision (b)(1). (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy H.*)[10] [existence of past domestic violence alone not enough to support jurisdiction, rather the Agency must prove domestic violence is "ongoing or likely to continue" and that it "directly harmed the child physically or placed the child at risk of physical harm"]; see *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824[11] ["While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.] Thus the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.' "].)

For example, in *Daisy H., supra*, 192 Cal.App.4th 713, the court concluded there was insufficient evidence to "support a finding that past or present domestic violence between the parents placed the children at a current substantial risk of physical harm" because "[t]he physical violence between the parents happened at least two, and probably seven, years before the [filing of] the petition," and there was no evidence the children were present when the violence occurred. (*Id.* at p. 717; see *Cole L., supra,* 70 Cal.App.5th at pp. 604–605 [insufficient evidence to support jurisdiction where incident of pushing and shoving occurred outside presence of children];

---

[10] Disapproved of on another ground in *D.P., supra*, 14 Cal.5th at page 278.

[11] Abrogated in part on another ground by *In re R.T.* (2017) 3 Cal.5th 622, 626–630 (*R.T.*).

19

*In re Ma.V.* (2021) 64 Cal.App.5th 11, 21–23 [insufficient evidence to support jurisdiction where it had been over 10 months since abuser had "left the family home," and the mother had "ended her relationship with him"]; *In re M.W.* (2015) 238 Cal.App.4th 1444, 1454 [insufficient evidence to support jurisdiction where "the record contains evidence that a single incident of domestic violence occurred more than seven years before the hearing" and no other evidence of altercations between the parents]; *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 120–121 (*Jonathan B.*) [insufficient evidence to support jurisdiction where the mother had lived apart from the father prior to the domestic violence incident and immediately reported it to the police and only other domestic violence incident occurred five years prior].)

Here, mother testified to three incidents of what she called "tussling," including the May 2021 incident during which both parents were arrested. While these incidents apparently involved some physical touching, there was no evidence of any physical injury and there was no evidence these arguments (and any pushing) ever occurred in the presence of minor. (See *Cole L., supra*, 70 Cal.App.5th at p. 606 [physical danger to children was minimal where minor incidents of domestic violence involved, at most, some pushing and grabbing, and no evidence domestic violence took place in the children's presence].)

Similarly, there is no evidence minor was present at any time mother received a "threatening" text message from father. The record is devoid of any specifics as to what these messages actually said or even how many were sent. No copies or screen shots of messages were ever shown to any Agency personnel or introduced at the hearing. Nor could mother elucidate at the hearing. The most she could say when asked whether father had sent threatening texts was that they argued by text and "at times, you know, they

could feel that way." While on an "abstract level" threats certainly are "incompatible with child safety . . . such generalities" are not evidence of an " 'identified, specific hazard in the child's environment' that poses a substantial risk of serious physical harm to him." (*In re J.N.* (2021) 62 Cal.App.5th 767, 776 (*J.N.*), italics omitted.)

The Agency does not dispute the state of the record but contends the juvenile court was "entitled to infer" some of the "conflictual relationship took place in front of the child, given [that] the parents had lived together for the first three months of the child's life." However, inferences must rest on evidence, not conjecture or speculation. (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15; *In re J.A., supra*, 47 Cal.App.5th at p. 1046.) Here, not only was there *no* evidence that the squabbling and physical contact between father and mother occurred in the presence of minor, but the evidence was uncontradicted that minor was, in fact, not present and was with his maternal grandmother on these occasions.

Moreover, there was no evidence any squabbling and shoving by mother and father, or any text "threats," was likely to continue and place minor at substantial risk of serious physical harm.

After the May 2021 incident, father moved away from mother, in part, because he "felt it was best for him to leave and have some space there, and he did." While the juvenile court uncharitably accused father of having "ditched" minor, the courts have repeatedly pointed out separation can be a proactive step to assist parents who are unable to reside together peacefully but who have given every indication they can interact appropriately with their children. (See *Jonathan B., supra*, 235 Cal.App.4th at pp. 119–121 [parental separation can be relevant where it eliminates danger to the children from domestic violence]; *Daisy H., supra*, 192 Cal.App.4th at p. 717

21

[past domestic violence is insufficient to support jurisdiction where there was "no evidence of any ongoing violence between the parents who are now separated"].)  Indeed, the Agency appears to have been of the latter view— that because father and mother were no longer residing together, there was no substantial risk of physical injury to minor from any earlier altercations between the couple—at the time it prepared its reports, since it did not refer father for any anger management (let alone domestic violence) assessment, or to an anger management (or domestic violence) program.  Nor did the Agency include any such assessments and programs in his case plan.  Rather, the only "follow up" was a suggestion the parents attend individual therapy "to learn to communicate with each other more effectively" as a "more suitable tool for the parents to co-parent together."

It is also true father did not deny hope of future reunification, stating "we're trying to accomplish things as parents and reunify our family."  But certainly a parent's desire to reunify his or her family is a laudable goal and not a basis for "inferring" that there is a "substantial risk" of "serious" physical harm to the minor in the absence of any evidence that reasonably suggests that is the case.  Indeed, father displayed awareness that "there's issues that we both need to work on before we quote/unquote say that we're intimately involved."  And he had attended, and was continuing to attend, the parenting skills program.

"Section 300, 'subdivision (b) means what it says.  Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a substantial risk of serious physical harm or illness.' " (*In re David M.* (2005) 134 Cal.App.4th

822, 829 (*David M.*), italics omitted.)[12]  Here, there is no substantial evidence of any "nexus" between the parents' prior arguments, shoving, and texting, and substantial risk of serious physical injury to minor.  (See *Cole L, supra*, 70 Cal.App.5th at pp. 604–608 [insufficient evidence to support finding that parents' domestic violence placed children at substantial risk of harm where "incident involved, at most, some pushing and grabbing for [father's] cell phone and took place outside presence of children," and no evidence threatening conduct would reoccur]; *Daisy H., supra*, 192 Cal.App.4th at p. 717 [insufficient evidence to support finding that past or present domestic violence placed children at substantial risk of harm when the domestic violence happened at least two years ago, and no evidence children were present and no evidence of ongoing violence between parents]; see also *J.N., supra*, 62 Cal.App.5th at p. 775 ["DCFS must establish a nexus between the parent's past conduct and the current risk of harm."].)

### *The B5 Count*

The B5 count alleged:  Father "reported that he used to abuse crack cocaine and alcohol but that he is about 2 years sober."  (Capitalization omitted.)

As we have recited, father did not dispute this allegation.  Nor, of course, did the Agency.  Instead, it expressed "concern" about his prior drug use and doubt about his sobriety.  The juvenile court, in turn, commended father for being forthright about his prior drug use and addiction, but doubted his credibility as to the state of his sobriety.

Again, the Agency had the burden of proving father's substance abuse history presented a substantial risk of serious physical harm to minor.  (See

---

[12]  Abrogated in part on another ground by *R.T., supra*, 3 Cal.5th at pages 628–629.

*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) However, it presented *no* evidence father's reported sobriety was false, let alone, that any prior or current drug use presented a substantial risk of serious physical harm to minor.

Rather, the Agency complained father did not complete an assessment and did not test until shortly before the hearing. It acknowledged, however, father was not required to do either before the hearing. It also essentially dismissed the fact that father *did* complete an assessment—which concluded he did "not meet medical necessity for . . . Substance Use Disorder Treatment"—and *did* test, with negative results. The Agency also stipulated that a line in the self-reporting assessment completed by staff stated "reporting two years of abstinence from cocaine and alcohol (consistent with A[V]ATAR records)." Nor did it take issue with father's counsel's representation to the court that AVATAR "is the official San Francisco City and County medical records system," and AVATAR "records would only reflect involvement in treatment. . . . You wouldn't be able to get into those records were there not some interplay with a public health provider for those services."

In short, the Agency presented *no* evidence that father had lied about his sobriety or that he had a current substance abuse problem that posed a substantial risk of serious physical harm to minor. Indeed, not a single witness testified father had abused drugs during the time he claimed to be sober. While "concern" that an addict will relapse is understandable, such "concern" untethered to any evidence that this is more than a theoretical possibility (as it is in the case of every addict) does not establish a substantial risk of serious physical injury to a minor. (See *J.N., supra*, 62 Cal.App.5th at p. 775 [no nexus between father's past substance abuse and any current risk of harm to minor]; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003

24

[substance abuse "standing alone" and "without more," is insufficient to support a section 300, subdivision (b) finding], italics omitted.)

## B. *Dispositional Orders*[13]

### *Removal from Noncustodial Parent*

#### *Applicable Statute*

After the hearing, the juvenile court entered a written order and checked the box stating: "Good cause appearing, the court hereby makes the following findings by clear and convincing evidence, pursuant to [section] 361(c): [¶] There is substantial danger to the physical safety, protection or physical or emotional well[-]being of the child[] or would be if the child[] were returned home, and there are no reasonable means by which the child's[] physical health can be protected without removing the child[] from the parents' . . . custody." (Capitalization omitted.)

Father contends the court erred in applying subdivision (c) of section 361, which applies to a custodial parent. The Agency agrees and

---

[13] Our conclusion that the jurisdictional findings as to father are unsupported does not automatically mandate reversal of dispositional orders pertaining to him since jurisdiction over the minor remains valid by virtue of the unchallenged findings against mother. (Cf. *In re Isabella F.* (2014) 226 Cal.App.4th 128, 138, 141 [vacating dispositional order when all findings supporting jurisdiction over child are vacated]; *In re James R.* (2009) 176 Cal.App.4th 129, 131, 137 [same], abrogated on another ground by *R.T., supra,* 3 Cal.5th at pp. 628–629; *David M., supra,* 134 Cal.App.4th at p. 833 [same].) Where jurisdiction still exists over the child, the juvenile court has discretion to require both parents—whether they are offending or nonoffending—to participate in educational and counseling programs that "the court deems necessary and proper." (§ 362, subd. (d); *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 (*I.A.*) ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established."].)

maintains the "operative section was section 361, subdivision (d)," which applies to a noncustodial parent.

Prior to 2018, the statutory framework was "silent on the factual findings necessary to order [the removal of] a child from the custody of a *noncustodial* parent." (Assem. Com. on Human Services (Reg. Sess. 2017–2018) as amended Mar. 28, 2017, p. 2, italics added.) Indeed, there was no specific statutory provision allowing juvenile courts to remove children from noncustodial parents. (Sen. Com. on Judiciary, Assem. Bill No. 1332 (Reg. Sess. 2017–2018), pp. 2, 5 ["situations where parents do not cohabitate and one parent has primary physical custody do not seem to be clearly provided for under existing law"].) Rather, the juvenile court's authority to remove children from noncustodial parents was implied or inferred from other statutory provisions. (See *In re Dakota J.* (2015) 242 Cal.App.4th 619, 628–629, 632–633 [juvenile courts may remove children from noncustodial parents under § 361, subd. (a), which authorizes courts to " 'limit the control to be exercised over the dependent child by any parent or guardian,' " and § 362, subd. (a), which authorizes courts to " 'make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support' " of a dependent child].)

Accordingly, in 2018, the Legislature sought to "clarify the juvenile court's authority to remove a child from the physical custody of a noncustodial parent" and establish "a specific standard for such removal." (Sen. Judiciary Com., Assem. Bill No. 1332 (Reg. Sess. 2017–2018), p. 2; see also Seiser & Kumli, on Cal. Juvenile Courts Practice and Procedure (2022) § 2.126(2)(a), pp. 2-483 to 2-484 ["Effective January 1, 2018, [section 361] has been amended to address removal from the physical custody of the parents . . . , with whom the child *did not reside* at the time the petition was

26

initiated."].)  The Legislature did so by amending section 361 and adding subdivision (d).

The juvenile court therefore erred in removing minor pursuant to section 361, subdivision (c), rather than subdivision (d).

Father maintains this error was prejudicial because subdivision (d) assertedly "applies a different standard" for removal than subdivision (c). Father is mistaken in this regard.

The legislative history reflects that in enacting subdivision (d), the Legislature adopted "the same standard used for removal of a child from the custody of a custodial parent" for "the removal of a child from the custody of a noncustodial parent."  (Sen. Judiciary Com., Assem. Bill No. 1332 (Reg. Sess. 2017–2018), p. 5; Assem. Com. on Judiciary, Assem. Bill No. 1332 (2017–2018 Reg. Sess.) as amended Mar. 28, 2017, p. 3 ["This bill . . . allow[s] removal from a parent with whom the child did not reside on the same basis as removal of a child from the custodial parent."]; see also Seiser & Kumli, on Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.126(2)(a), pp. 2-483 to 2-484 ["the same standard applies to a removal from the physical custody of a parent with whom the child did *not* reside as the removal of physical custody from a parent with whom the child did reside"].)

Thus, although the juvenile court erred in checking the section 361, subdivision (c) box on the dispositional order, any error was harmless, given that both subdivision (c) and subdivision (d) impose the same fact-finding requirements and heightened clear and convincing burden of proof for removal.[14]

---

[14] We therefore need not, and do not, address father's assertion that removal also was improper under section 361.2, since that section pertains to a noncustodial parent who is requesting custody, and he was not affirmatively doing so.  (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820.)

27

### *Sufficiency of the Evidence*

Section 361, subdivision (d) states as follows:  "A dependent child shall not be taken from the physical custody of his or her parents, guardian, or Indian custodian with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent, guardian, or Indian custodian to live with the child or otherwise exercise the parent's, guardian's, or Indian custodian's right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's, guardian's, or Indian custodian's physical custody."

" 'The elevated burden of proof for removal from the home . . . reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so.  [Citations.]  By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the "bias of the controlling statute is on family preservation, not removal." ' "  (*In re M.V.* (2022) 78 Cal.App.5th 944, 959, quoting *In re A.R.* (2015) 235 Cal.App.4th 1102, 1115 (*A.R.*).)

---

In any case, any error in applying section 361.2 also would have been harmless.  (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303–304 [error in applying section 361.2, rather than section 361 subdivision (c) (which applies the same standard as subdivision (d)), was harmless given similarity of the standards set forth in the statutes].)

28

Indeed, "[a] dispositional order removing a child from a parent's custody is 'a critical firebreak in California's juvenile dependency system' [(*In re Paul E.* (1995) 39 Cal.App.4th 996, 1003 . . . )], after which a series of findings by a preponderance of the evidence may result in termination of parental rights." [Citation.]  Thus, California dependency laws "establish that out-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts.  It is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent.  The law requires that a child remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a disposition would harm the child.  The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children." (*In re M.V., supra,* 78 Cal.App.5th at p. 959, quoting *In re Henry V.* (2004) 119 Cal.App.4th 522, 525, italics added.)

At the hearing, father's counsel, citing to *In re Serenity S.* (2020) 55 Cal.App.5th 355 (*S.S.*), argued there was no evidence, let alone clear and convincing evidence, of a substantial danger to the child and no reasonable means to protect the child without removal.  (§ 361, subd. (d).)  Rather, the only concern that could have any traction, said counsel, "would be based on the fact he has no housing. . . . [¶] . . . [¶] The only thing stopping him from being able to provide a home for his son is that he does not presently have housing.  He is not asking for custody right here today because he doesn't have housing."  But the fact he did not yet have suitable housing could not, under *S.S.*, be the basis for a removal order.

29

Counsel for the Agency responded, "we are concerned because the father knowingly left his child with a parent that he knew or reasonably should have known had a chemical dependency problem that posed a risk to this child. . . . [¶] . . . [¶] The father voluntarily elected to leave to go to New York for reasons that are in his own state of mind. But he left right after the tussle incident with the mother. The domestic violence incidents that the mother has detailed, those are the reasons the Agency is concerned."

Defense counsel continued to emphasize that the court was required "to find clear and convincing evidence that father poses a risk of detriment to the child in order to remove from father. [¶] We are not seeking custody today; therefore, the court does not need to remove from father. The case of *In re S.S.* discusses this scenario where a parent has no housing. He desperately needs help with housing. That is what we're asking for."

The juvenile court ruled that on the basis of "clear and convincing" evidence "there is substantial danger to the physical health, safety, protection, or physical and emotional well-being of the child, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from both the parents." The court identified the following as the basis for its ruling: "The facts . . . included in the petition that the court did sustain, and the allegations under [section] 300(b);" and the "the issues and concerns" raised about father in the Agency's reports—that father left for New York three months after minor was born, the domestic violence between mother and father, the "recency of his cocaine" abuse, that there was "no proof" of his "current parenting skills or prior skills," and that father had no means to support minor and no housing to keep minor "safe and protected." The court went on to comment that

30

"While I understand you're not asking for [custody] today, the court is making the decision about it today."

In short, the juvenile court found that the record before it not only supported jurisdiction under a preponderance of the evidence standard, but it also supported removal from custody under the significantly heightened clear and convincing evidence standard.

Given that we have concluded that the court's jurisdictional findings are not supported by substantial evidence, we necessarily reach the same conclusion as to the court's removal findings, i.e., that the removal order is not supported by substantial evidence, particularly taking into account the higher clear and convincing standard of proof.

We have discussed in detail why the Agency's showing fell short of establishing jurisdiction as to father, and we need not repeat that discussion here. We observe, however, that in arguing removal was warranted, the Agency identified two "concerns"—that father "left his child" with "a parent that he knew or reasonably should have known had a chemical dependency problem that posed a risk to this child," and the "domestic violence incidents that the mother has detailed."

As to the first concern, there was evidence mother had abused drugs prior to the pregnancy. But there was no evidence she did so during the pregnancy (notably there was no evidence in the record that minor was born with an addiction). There was also evidence the Agency received two referrals after the birth, on June 8 and 9, that alleged "mother's drug use is affecting her care of the minor" and in the second referral, the social worker "discovered the mother's substance use and her mental health issue might be affecting the mother's care of the minor." The first referral was "evaluated out." The second was "closed" because mother agreed grandmother would

31

provide care and supervision of minor in the event mother was under the influence and because mother was connected to and using various community services. When father left for New York is unclear. He testified he left June 9; in his motion for presumed father status, he said he left June 29. He also testified he was not aware of mother's drug use until after he moved out. So the evidence arguably supports an inference he knew or should have known of mother's resumed use.

But awareness mother used, without more, cannot not support jurisdiction as to father (or even mother), let alone a removal order as to father. (See *J.A., supra*, 47 Cal.App.5th at p. 1046 ["dependency cannot be based on substance abuse alone; jurisdiction requires a substantial risk of harm to the child arising from the substance abuse"].) Furthermore, the Agency "evaluated out" the first referral and it "closed" the second in light of maternal grandmother's agreement to care for minor if mother again used and mother's access to and use of community services. Given that the Agency was satisfied with this handling of the incidents, father certainly cannot be penalized with loss of custody by failing to perceive mother's use created "a substantial danger to" the minor.

Furthermore, there is *no* evidence whatsoever that "there are no reasonable means by which the child's physical and emotional health can be protected" from mother's addiction "without removing" minor from *father's* legal custody.

As to the second concern—the incidents of domestic violence to which mother testified—there is, as we have discussed, *no* evidence the parents' arguments and any touching occurred in minor's presence or presented a "substantial risk" of "serious physical harm" to minor, let alone, evidence sufficient to support a finding on the basis of "clear and convincing" of "a

substantial danger to" minor.  There is also *no* evidence, let alone evidence sufficient to support a finding by clear and convincing evidence, that "there are no reasonable means by which the child's physical and emotional health can be protected" from this concern "without removing" minor from *father's* legal custody.  (See *In re I.R.* (2021) 61 Cal.App.5th 510, 513, 521–522 [evidence insufficient to support removal from father as record did not contain evidence minor was in substantial danger in the father's care nor was there evidence that "there were no 'reasonable means' to protect [the minor] other than removing her from Father"]; see also *Isayah C.* (2004) 118 Cal.App.4th 684, 700 ["[A] parent may have custody of a child, in a legal sense, even while delegating the day-to-day care of that child to a third party for a limited period of time."].)

To the contrary, by residing apart from mother, father has already taken a step expressly approved in section 361, subdivision (c) as a "reasonable means to protect the minor."  (§ 361, subd. (c)(1); see *A.R., supra*, 235 Cal.App.4th at p. 1118 [evidence insufficient "to establish existence of a 'substantial danger' within meaning of section 361, subdivision (c)," where the "father had already removed himself from the home," and there was "no evidence that father intended to move back into the home"].)

As for the additional reasons recited by the court—the "recency" of father's cocaine abuse, "no proof" of his "current parenting skills or prior skills," and no means to support minor and no housing to keep minor "safe and protected"—they do not singularly or collectively constitute substantial evidence, let alone taking into account the heightened clear and convincing standard of proof, that there "would be a substantial danger" to the "physical or emotional well-being" of the minor absent removal from father's legal custody.  We have discussed at some length the absence of any evidence that

33

minor is at substantial risk of serious harm in light of father's prior drug abuse. There is also *no* evidence minor is at risk due to the lack of any parenting skills. To the contrary, the evidence was undisputed that father attended to the infant appropriately, that he provided economic and material support while he lived in New York, and that he was attending parenting classes. Thus, there is also *no* evidence, let alone evidence sufficient to support a finding by clear and convincing evidence, that "there are no reasonable means by which the child's physical and emotional health can be protected" from any concern about parenting "without removing" minor from father's legal custody. And finally, as *S.S.* holds, a child cannot be taken from a parent's legal custody solely on the basis of the parent's poverty. Rather, the Agency must make every effort to assist the parent in securing employment and housing. The Agency made no such showing here. And father, on his own, had secured employment.

### *Drug Testing and Treatment Program*

Father also challenges dispositional orders requiring drug testing and substance abuse treatment, asserting there was "no evidence of any current substance abuse."

The Agency maintains father has forfeited this challenge because he did not object to these orders in the juvenile court. And, indeed, as a general rule, failure to object in the juvenile court forfeits a parent's right to pursue an issue on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293;[15] accord, *In re N.O.* (2019) 31 Cal.App.5th 899, 935 [" 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture . . . applies in juvenile

---

[15] Superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.4th 953, 962.

dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.' "].)

However, a recognized exception to forfeiture is futility. (See *People v. Gomez* (2018) 6 Cal.5th 243, 286–287 [" 'Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . .' "].) As we have recited, father's attorney repeatedly argued there was no evidence that could support a jurisdictional finding or a dispositional removal order based on prior drug abuse. Given that the juvenile court rejected these arguments, we conclude any further objection to an additional disposition order requiring testing and treatment would have been futile. We therefore conclude father has not forfeited his challenge to the orders on appeal and turn to the merits.

Under section 362, subdivision (a), a juvenile court can "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) The problem the court seeks to address need not be described in the sustained section 300 petition. (See *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006–1008.) "In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311; see also *I.A., supra*, 201 Cal.App.4th at p. 1492 ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established."].)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) Although the court "should be mindful of the burdens their disposition orders impose

on parents already grappling with difficult conditions and circumstances," the "paramount concern always must be the child's best interest . . . no matter how burdensome its requirements may seem from the parent's perspective." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071–1072.)

Nevertheless, a juvenile court's discretion is "not unfettered." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1229.) The court's orders must be " 'reasonable' " and, as is critical here, " 'designed to eliminate those conditions that led to the [juvenile] court's finding that the child is a person described by Section 300.' " (*In re D.M.* (2015) 242 Cal.App.4th 634, 639, quoting § 362, subd. (d).) Thus, while the juvenile court "may direct any reasonable orders to the parents" of a dependent child, which may include participating in a counseling or education program," this is "provided the program shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).)

Given that no sufficient evidence supported the juvenile court's jurisdictional finding based of father's alleged substance abuse, the dispositional testing and treatment orders aimed at eliminating *that* invalidated jurisdictional finding must also be reversed. In other words, in the absence of that jurisdictional finding, there is no nexus between the remaining valid conditions leading to the dependency and the challenged disposition orders. (§ 362, subd. (d) [dispositional order requiring participation in programs "shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300"]; see *In re R.M.* (2009) 175 Cal.App.4th 986, 991 [in light of court's "determination that the jurisdictional order must be reversed," dispositional order placing children outside the mother's home "and all subsequent dispositional orders" as to the mother "must be reversed as well"];

36

cf. *D.P., supra*, 14 Cal.5th at p. 277 ["reversal of the jurisdictional finding calls into question the validity of orders based on the finding"].)

## C. *ICWA*

In March 2022, the social worker asked father if he knew of any Native American ancestry in his family, and father reported he did not know "for sure if his family has any registration with a tribe but that he knew that his mother is Shinnecock. He reported remembering that he had went to some events when he was younger [on] a reservation. He said his sisters might have more information." The Agency stated further inquiry was necessary because there was "reason to believe the child may be an Indian child." (Boldface omitted.)

Three days later, father filed an ICWA-020 form. He marked the box indicating "[o]ne or more of [his] parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe." He stated, "[s]ome cousins lived on reservation (child's paternal great grandmother lived on reservation and current family members live on reservation) Shinnecock Tribe South Hampton." He then listed the name of minor's paternal great grandmother.

The Agency's jurisdiction and disposition report noted father had completed an ICWA-020 form and indicated he had "Native American/Indian ancestry on his mother's side of the family." The Agency stated despite naming the tribe—Shinnecock—father "has no other information of his Native American/Indian status except to indicate his sister . . . , would have more information." He provided his mother and grandmother's name, both of whom were deceased, and stated it was his grandmother "who has the Native American/Indian ancestry." The social worked contacted one paternal aunt on two separate occasions but did not receive a response, and she contacted

37

another paternal aunt once and also did not receive a response.  Father indicated "no immediate family, including himself, has lived on a Native American/Indian reservation;" "attended a Native American/Indian school;" "has registered" with a tribe; or "received services" from a tribe.

The Agency noted further inquiry was required because father had claimed Indian ancestry and there is reason to believe minor "is an Indian child, but there is not sufficient information to determine there is reason to know" minor is an Indian child and further investigation is warranted.  The report stated "Pending the response from [the Bureau of Indian Affairs] and Shinnecock Tribe as identified by the father's maternal side of the family might have Native American Ancestry."

Under a section in the report labeled "Formal Notice," (capitalization & boldface omitted) the Agency checked the box stating, "The following efforts to gather family tree information necessary to complete the ICWA-030 were made:  5/18/2022.  Family information gathered, documented above (in Further Inquiry grid), or in the attached family tree form, was included in the ICWA-030 notice."

The juvenile court did not make any ICWA findings at either the detention hearing or at the jurisdiction and disposition hearing.

Father contends the court "erred in removing the child from father and placing him in foster care where the child was an Indian child and no notice as required by ICWA was provided."

The Agency maintains there was "no reason to know [minor] is an Indian child," and ICWA notice was not required.  In essence, the Agency contends "[f]ather conflates two separate and distinct provisions of section 224.2, namely the 'reason to know' provisions . . . and the 'reason to believe' provision."  We agree.

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (§ 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

"It is important . . . to recognize the distinction between 'reason to believe' and 'reason to know.' A reason to believe should trigger further inquiry . . . , while a reason to know is the standard that requires actual notice." (Seiser & Kumli, on Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.125(2)(b), p. 2-451, citing §§ 224.2, 224.3, subd. (b); Cal. Rules of Court, rule 5.481(b).)

Preliminarily, we note the Agency never marked any box indicating there was a reason "to know;" rather, it only indicated further inquiry was required because there is reason "to believe" minor is an Indian child.

In any event, here there was no reason to know minor was an Indian child. Section 224.2, subdivision (d) "specifically delineates when there is reason to know a child involved in a proceeding is an Indian child." (Seiser &

39

Kumli, on Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.125(2)(b), p. 2-452.)[16]  None of those criteria are met in this case, nor does father contend they are.

In contrast, subdivision (e) of section 224.2 provides, "If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the . . . social worker . . . shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable. [¶] (1) There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe.  Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive of subdivision (d)." (§ 224.2, subd. (e)(1).)

---

[16] Section 224.2, subdivision (d)(1)–(6) provides, "There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances:  [¶] (1) A person having an interest in the child . . . informs the court that the child is an Indian child.  [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village.  [¶] (3) Any participant in the proceeding . . . informs the court that it has discovered information indicating that the child is an Indian child.  [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court.  [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."

Here, it is clear the Agency had a reason to believe, but did not have sufficient information to determine there was a reason to know, minor was an Indian child.

Defendant relies on *In re N.D.* (2020) 46 Cal.App.5th 620, a case he claims is "factually identical," to support his contention that "the juvenile court is not authorized to proceed with foster placement of an Indian child until ICWA notice has been sent and received." However, this case was decided before the Legislature provided a definition for "reason to believe." (See Seiser & Kumli, on Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.125(2)(b), p. 2-452 ["Previously there was no definition of reason to believe. . . . This was resolved by the passage of Assembly Bill (AB) 2944 [Stats. 2020, ch. 104]," effective Sept. 18, 2020.].)

Accordingly, as the initial inquiry only established a reason to believe, and not a reason to know, we conclude there was no error in compliance with the ICWA requirements.[17]

---

[17] In his reply brief, father suggests that "[w]ith no ICWA findings . . . and nothing in the oral record, it cannot be assumed that the Agency met its duty of further inquiry." To the extent father challenges the Agency's duty of inquiry, we hold his claim is premature. (*J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 461 ["because the juvenile court made no final ICWA ruling at or before the challenged dispositional hearing as to whether ICWA applied to the proceedings, mother's claim is premature"].) "That is, ICWA issues are not ripe for review. ' "Ripeness" refers to the requirements of a current controversy.' [Citation.] An issue is not ripe for review unless and until it is 'sufficiently concrete to allow judicial resolution even in the absence of a precise factual context.' [Citations.] Because the dependency case is still ongoing, any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of ongoing dependency proceedings." (*Id.* at p. 461, citing *In re M.R.* (2017) 7 Cal.App.5th 886, 904 [determining ICWA claim premature where no final ICWA ruling made at dispositional hearing]; see *In re S.H.* (2022) 82 Cal.App.5th 166, 171 [holding reversal of an early dependency order not warranted where parent has shown Agency's

### III. DISPOSITION

The jurisdictional findings and orders as to father, as well as the related dispositional orders regarding removal and substance abuse testing and treatment, are reversed. The matter is remanded to the juvenile court with directions to dismiss the petition as to father.

---

ongoing inquiry obligations have not yet been satisfied by the time of the parent's appeal].)

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

Margulies, J.


A166150, San Francisco Human Services Agency v. WF

43

Trial Court: Superior Court of San Francisco City and County

Trial Judge: Hon. Braden C. Woods

Counsel:

Linda S. Votaw, under appointment by the Court of Appeal, for Defendant and Appellant.

David Chiu, City Attorney, Kimiko Burton, Lead Attorney and Elizabeth McDonald Muniz, Deputy City Attorney for Plaintiff and Respondent.